(169 App. Div. 540)

### In re BURNSTINE.

(Supreme Court, Appellate Division, First Department. November 5, 1915.)

ATTORNEY AND CLIENT ☞38—MISCONDUCT—COMPROMISE.

    An attorney, who in settling an insurance controversy receipts for a larger amount than he receives, that the fraternal organization may obtain credit for liberality, for advertising purposes, is open to severe censure therefor.

    [Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 51, 61; Dec. Dig. ☞38.]

Proceeding by the Bar Association against Henry C. Burnstine, an attorney and counselor at law, for professional misconduct. Respondent severely censured.

See, also, 160 App. Div. 890, 144 N. Y. Supp. 1107.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, SCOTT, and DOWLING, JJ.

Einar Chrystie, of New York City (Maurice Leon, of New York City, of counsel), for petitioner.

Henry A. Rubino, of New York City, for respondent.

PER CURIAM. This is an unusual case. The charge against the respondent is that he wrongfully retained and refused to account for the sum of $500, which he collected in August, 1908, for his aunt, Aurelia M. Burnstine. In the year 1907 one Isidore S. Burnstine, a son of Aurelia M. Burnstine, died under circumstances which indicated that he had committed suicide, and as it was found by the coroner's jury that he had done. He left four policies of life insurance, in three of which his mother was named as beneficiary. These policies were at first placed in respondent's hands for collection, but after a week or two were taken out of his hands and intrusted to a firm of lawyers in Yonkers, where Isidore had lived and had died. As these lawyers, after a year had elapsed, had made no visible progress towards collection, the policies were again placed in respondent's hands. He soon collected, under settlement, upon three of these policies, receiving $1,900, which he paid over to his aunt without deduction. There remained a policy for $2,000, issued by the Knights of Honor, a fraternal organization, which policy contained a suicide clause, which, under the circumstances, made any collection a matter of some doubt. After some correspondence with this organization, respondent was visited by a Mr. Boem, a lawyer of standing in St. Louis, Mo., who agreed to settle the claim for the sum of $1,800, for which a draft, drawn to respondent's order as attorney, was sent. This draft was drawn on the Mercantile Trust Company of St. Louis, and was so phrased that it would be paid only if accompanied by the benefit cer-

tificate and a release duly executed by Mrs. Burnstine. Respondent prepared a release and forwarded it to his aunt, then living in Detroit, who executed it and returned it to him.

Although he himself had a bank account at that time, he deposited the draft to the account of his uncle, Nathan Burnstine, in the Mutual Alliance Trust Company of this city, and it was paid in due course. Nathan Burnstine was apparently a man of some means, carrying a bank account of some size. He had left this city for Detroit a few days before the draft was paid, leaving with respondent two blank checks signed. One of these checks respondent filled in to his own order for $298.20, which concededly represented the fee charged by him for collecting the four policies. The other check he filled out to his own order for $500. It was apparently arranged between him and Nathan Burnstine that the latter should pay the remaining $1,000 to Mrs. Burnstine in Detroit. For some reason he did not do so, but after he returned he gave respondent a check for $1,000, which was sent to and receipted for by Mrs. Burnstine. The whole controversy turns upon the disposition made by respondent of the $500 represented by the check referred to. He never personally explained to his aunt and client how he had used it, or why he had not sent it to her. He claims that he explained all the circumstances to Nathan Burnstine, his uncle, and to Albert Burnstine (now dead), the son of his client, and that they explained the whole matter to Mrs. Burnstine. In this he is corroborated by Nathan Burnstine, and to some extent by an affidavit made by Albert Burnstine, and by the testimony of Mrs. Burnstine.

In the year 1910 Mrs. Burnstine initiated a litigation against Nathan Burnstine, her brother-in-law, retaining for that purpose the firm of Strauss & Boyer. In the course of her consultation with these attorneys she mentioned the circumstances of the retention by respondent of this sum of $500. Thereupon, acting on the advice of her attorneys, she began a summary proceeding against respondent to compel payment. He opposed her application, but refused to disclose to the court what he had done with the money. The motion for payment was granted by Mr. Justice Page, who filed a memorandum sharply criticizing respondent's lack of frankness to his client, whereupon, without waiting for an order to be entered, respondent paid over the money. It should be said that before this proceeding was begun Mr. Strauss sought an interview with respondent, in the presence of his counsel, Mr. Severance, and begged for an explanation, even offering to keep anything respondent might say as confidential. Respondent, however, absolutely refused to make any explanation. Noticing Justice Page's memorandum, the grievance committee of the Bar Association invited respondent to meet them, which he did, but still obstinately refused to make any statement or give any explanation as to the disposition of the $500. Thereupon this charge was preferred and sent to the official referee, whose report is now before us, and now for the first time respondent offers his explanation.

This explanation is as follows: That Mr. Boem offered to settle the claim for $1,300, but said that the organization wished it to appear that, notwithstanding the probable defense of suicide, it was very liberal in its settlement, deducting only 10 per cent. of the face of the

claim. That to carry this out the company would pay $1,800, with the agreement that respondent would immediately repay $500, the purpose being that the organization might show "for advertising and argumentative purposes" the liberality with which they deal with members. He says that he consulted his uncle, Nathan Burnstine, and his cousin, Albert Burnstine (but not his client), and on their advice settled the claim in this way. He says that Boem did not stay in New York until the settlement was completed, but introduced another man to respondent as the person to whom the $500 might be paid, and he says that he did pay that sum to the person so indicated. He is unable to give the name, or even to describe the person to whom he made the payment, and he has no receipt or scrap of paper of any kind to corroborate the fact of payment. It is made clear by the evidence that the Knights of Honor never received the rebate, and Mr. Boem, whose evidence was taken by commission, absolutely denies that any such arrangement was made as testified to by respondent, or that he (Boem) ever received the rebate or any part of it. The official referee accepts the respondent's explanation and fully exonerates him.

The story on its face is an improbable one, and we can find no reasonable explanation why, if it is true, respondent did not take some precaution for his own protection, such as a receipt, or at least a memorandum, by which he could identify the person to whom he paid the money. The referee appears to consider that respondent is corroborated by the testimony of his uncle, his cousin, and his aunt. But after all their testimony, at best, only goes to show that he *told them* the same story that he tells now. There is no corroboration of the fact of the agreement for a rebate. So, too, there is no satisfactory explanation as to why he used his uncle's bank account, instead of his own, or why he refused to make an explanation to the court when called upon to do so. The referee had the advantage of seeing respondent and hearing him testify, and we hesitate, for that reason, to reverse his finding; but upon his own story the respondent is open to severe censure, in lending himself to a scheme to enable the Knights of Honor to gain credit upon the strength of a false appearance of liberality, and in refusing to state the facts frankly to the court when called upon to do so.

The court, therefore, severely censures the respondent for the acts to which we have referred. Settle order on notice.